AO 91 (Rev. 11/11)   Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT

08/27/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT

August 27, 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KC _____ DEPUTY

United States of America )
v. )
Kresimir MENDOZA )
)  Case No. 5:21-mj-00559
)
)
)
)

_____
Defendant(s)

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Unknown to April 30, 2021   in the county of   San Bernardino   in the
Central   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Production of Child Pornography |
| 18 U.S.C. § 2 | Aiding and Abetting |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Jonathan Ruiz, Special Agent/HSI
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   August 27, 2021

_____
Judge's signature

City and state:   Riverside, California    Honorable Sheri Pym, Magistrate Judge
_____
Printed name and title

*AUSA:*  Tritia Yuen:  951-276-6222

**AFFIDAVIT**

I, Jonathan Ruiz, being duly sworn, declare and state as follows:

**I.    PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of complaint and arrest warrant against Kresimir MENDOZA ("MENDOZA") for a violation of Title 18, United States Code, Section 2251(a) (Production of Child Pornography) and 18 United States Code, Section 2 (Aiding and Abetting).

2.    This affidavit is also made in support of an application for a warrant to search (1) the premises at 18470 Bohnert Avenue, Rialto, California 92377 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1; and (2) the person of MENDOZA, as described more fully in Attachment A-2.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 2251(a) (Production of Child Pornography), 2252(d) (Advertisement of Child Pornography), 2251(c) (Sexual Exploitation of Children), 2252A(a)(2)(A) (Receipt and Distribution of Child Pornography) and 2252A(a)(5)(B) (Possession of Child Pornography) (collectively, the "SUBJECT OFFENSES"), as more fully described in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.   I am a Special Agent ("SA") with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since 2007.  From April 2007 to November 2014, I was assigned to the Child Exploitation Investigations Group for the HSI Office of the Special Agent in Charge, Los Angeles, California.  In November 2014, I transferred to the Child Exploitation Investigations Group for the HSI Office of the Assistant Special Agent in Charge, Riverside and San Bernardino, California.  My daily duties as an SA include investigating criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A.  During the course of these investigations, I have participated in the execution of numerous search warrants and seized evidence of such violations.

6.     Through my training and experience, I have become
familiar with the methods of operation used by people who
sexually exploit children.  I have attended training classes and
seminars concerning computer crimes and the sexual exploitation
of children on the Internet.  My training and experience in
these investigations has given me an understanding of how people
involved with offenses relating to the sexual exploitation of
children use the Internet to further those offenses.

### III.  SUMMARY OF PROBABLE CAUSE

7.     Between February and July 2021, HSI Riverside received
four leads on five online user accounts that were believed to be
involved in the distribution of child pornography and/or used to
engage minors online and solicit them to produce and distribute
sexually explicit material.  Each of the user accounts utilized
the internet service assigned to the residence at 18470 Bohnert
Avenue, Rialto, California 92377, the SUBJECT PREMISES.

8.     First, in or about February 2021, HSI Riverside
received information from a law enforcement officer in the
United Kingdom who in August 2020 had received a call from the
father of an 11-year-old female ("MINOR 1").  The father
reported that an unknown individual had been inappropriately
communicating with MINOR 1 on Instagram, a U.S.-based social
media and communications platform.  The father further reported
that the unknown individual used the Instagram username
"NANAJAHDY," and that during these communications with MINOR 1,
"NANAJAHDY" threatened MINOR 1 and influenced MINOR 1 to produce
at least two videos of herself, one of which depicted MINOR 1

exposing her bare chest to the camera.  After receiving the videos from MINOR 1, "NANAJAHDY" demanded more videos from MINOR 1 and threatened MINOR 1 with sharing the videos he previously received from her with others if she did not send more.  MINOR 1 notified her parents who subsequently reported the incident to law enforcement in the United Kingdom who requested assistance from HSI Riverside.  HSI Riverside has determined that "NANAJAHDY" used the internet service assigned to the SUBJECT PREMISES.

9.    Second, in May 2021, Snapchat, a U.S.-based social media and communications application for mobile devices doing business as Snap Inc., reported to the National Center for Missing and Exploited Children ("NCMEC") that two user accounts, "BEND9525" and "B_OVER7902," uploaded child pornography to the Snapchat platform.  Snap Inc. provided NCMEC with user-inputted account registration information and one login record each for "BEND9525" and "B_OVER7902."  The information was subsequently forwarded to HSI Riverside for investigation where it was determined that "BEND9525" and "B_OVER7902" were both accessed from the internet service assigned to the SUBJECT PREMISES.

10.   Third, in or about June 2021, HSI Riverside received information from law enforcement in Canada that in April 2021, the Canadian law enforcement agency had received information from the parent of a 12-year-old female ("MINOR 2").  The parent reported that an unknown individual using the Snapchat username "CALI.REPTILES" had been inappropriately communicating with "MINOR 2" on Snapchat, as well as with MINOR 2's friend ("MINOR

3") from the phone number (909) 550-3282 ("SUBJECT PHONE NUMBER
1").  The parent further reported that the unknown individual
threatened MINOR 2 and influenced MINOR 2 to produce and send
images and videos of her vagina and videos of herself
masturbating.  "CALI.REPTILES" harassed MINOR 2 and also began
communicating with MINOR 3, telling MINOR 3 to relay messages
and threats to MINOR 2.  Law enforcement in Canada subsequently
learned during their investigation that "CALI.REPTILES" used the
internet service assigned to the SUBJECT PREMISES.
Additionally, HSI Riverside learned that SUBJECT PHONE NUMBER 1
was registered to Juan Mendoza at the SUBJECT PREMISES.  Juan
Mendoza is believed to be the father of Kresimir MENDOZA.

11.  And fourth, in or about July 2021, HSI Riverside
received information from law enforcement in Colorado that in
May 2021 the Colorado law enforcement agency had received
information from the parent of a 14-year-old female ("MINOR 6").
The parent reported that the Instagram user "BENT7385" had been
communicating with MINOR 6 and threatening to show up to MINOR
6's home if she did not send him "nudes."  Subscriber
information for "BENT7385" obtained by law enforcement in
Colorado showed that the phone number registered to the account
was (909) 871-8007 ("SUBJECT PHONE NUMBER 2") reported by T-
Mobile as being registered to Kresimir MENDOZA at the SUBJECT
PREMISES.  Additionally, "BENT7385" was accessed from the
internet service assigned to the SUBJECT PREMISES.

12.  On July 16, 2021, I obtained a federal search warrant,
Case No. ED CR 21-MJ-480, to search Snapchat accounts

"CALI.REPTILES," "B_OVER7902," and "BEND9525" ("SNAP SEARCH WARRANT").  Upon reviewing the search results, I determined that the user of these accounts is Kresimir MENDOZA.  One basis for this conclusion was that I found communications sent from "CALI.REPTILES" that included a screen capture of MENDOZA's payroll deposit from his employer Target Corp.  Additionally, while reviewing the video recorded "Memories" saved to the "CALI.REPTILES" account, I found two videos recorded on October 6, 2020, that depicted a nude Hispanic male adult recording himself masturbating.  The camera is closely focused on the male adult's penis.  However, during one of these two videos, the male's face is clearly visible and appears to be the same person depicted on MENDOZA's California Identification Card.

## IV.   BACKGROUND REGARDING CHILD EXPLOITATION OFFENSES, COMPUTERS, AND THE INTERNET

13.  Based upon my training and experience in the investigation of child pornography, and information given to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers and child pornography:

14.  Computers.  Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.  Child pornography formerly was produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill to develop and reproduce the images.  There were definable costs involved with

the production of pornographic images.  To distribute these images on any scale required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these images was accomplished through a combination of personal contacts, mailings, and telephone calls.

15.  The development of computers has changed this. Computers serve four basic functions in connection with child pornography:  production, communication, distribution, and storage.  Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner.  With the advent of digital cameras, the images can now be transferred directly onto a computer.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

16.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files.  One terabyte external and internal hard drives are not uncommon.  Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash"

drives, which are very small devices plugged into a port on the computer.  It is extremely easy for an individual to take a photo with a digital camera or smartphone, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them).

17.  Media storage devices can easily be concealed and carried on an individual's person.  It is particularly common for individuals to regularly carry their smart phones on them. These devices can store thousands of images of child pornography and connect directly to the Internet as well as other cellular devices.

18.  <u>Internet</u>.  The Internet is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information.  Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located in the same state.

19.  <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts

that allow users to communicate with other Internet users by
sending and receiving electronic messages through the ISPs'
servers; remotely store electronic files on their customers'
behalf; and may provide other services unique to each particular
ISP.  ISPs maintain records pertaining to the individuals or
businesses that have subscriber accounts with them.  Those
records often include identifying and billing information,
account access information in the form of log files, e-mail
transaction information, posting information, account
application information, and other information both in computer
data and written record format.

20.  IP Addresses.  An Internet Protocol address ("IP
address") is a unique numeric address used by each computer on
the Internet.  An IP address is a series of four numbers, each
in the range 0-255, separated by periods (e.g., 121.56.97.178).
Every computer attached to the Internet must be assigned an IP
address so that Internet traffic sent from and directed to that
computer may be properly directed from its source to its
destination.  Most ISPs control a range of IP addresses.

21.  When a customer logs into the Internet using the
service of an ISP, the computer used by the customer is assigned
an IP address by the ISP.  The customer's computer retains that
IP address for the duration of that session (i.e., until the
user disconnects), and the IP address cannot be assigned to
another user during that period.

22.  The following definitions apply to this Affidavit and
Attachments B:

a.   "Child pornography," "minor," and "sexually explicit conduct," are defined as set forth in Title 18, United States Code, Section 2256.

b.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

c.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors, but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

d.   "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

e.   "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

f.   A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## V.   STATEMENT OF PROBABLE CAUSE

23.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in this investigation, I am aware of the following:

**A.   First Lead: MINOR 1, an 11-year-old Female Minor in the United Kingdom, Reports Online Sexual Exploitation by Instagram User "NANAJAHDY"**

24.   From my review of investigative reports written by Detective Constable ("DC") Rebecca Smith of the Norfolk Constabulary in the United Kingdom, as well as communications I had with DC Smith, I learned the following:

a.   On or about August 9, 2020, law enforcement in the United Kingdom received a call from MINOR 1's father who reported that an unknown individual had been communicating with MINOR 1 on social media and that the individual (believed to be male) influenced MINOR 1 to produce and send inappropriate images of herself.

b.   On August 13, 2020, law enforcement in the United Kingdom responded to MINOR 1's residence and subsequently obtained MINOR 1's mobile phone and placed it into "airplane mode" to prevent data on the device from being changed.

c.   On or about September 22, 2020, DC Smith reviewed MINOR 1's phone, specifically the conversation between MINOR 1 and the Instagram user account "NANAJAHDY."  DC Smith created a video recording of MINOR 1's phone as she scrolled through the messages.  I have since reviewed the video recording created by

DC Smith which captured communications between MINOR 1 and "NANAJAHDY" from August 4, 2020, and August 9, 2020.  During these communications, MINOR 1 produced and subsequently sent two videos at "NANAJAHDY's" request.  The first video depicts MINOR 1 lifting up the purple-colored t-shirt she is wearing and briefly exposing her bare chest to the camera.  The second video shows MINOR 1 standing in front of the camera fully clothed. She is wearing black shorts and the same, purple-colored shirt. MINOR 1 is depicted bending over in front of the camera with the focus being on her clothed buttocks.  After MINOR 1 sent the first two videos to "NANAJAHDY," "NANAJAHDY" wanted MINOR 1 to send more videos.  "NANAJAHDY" then threatened MINOR 1, telling her that if she didn't do what "NANAJAHDY" asked, "NANAJAHDY" would share the videos of MINOR 1 with her Instagram followers.

        d.   On or about October 17, 2020, law enforcement in the United Kingdom contacted Instagram (doing business as Facebook Ireland Ltd.) and requested subscriber information for "NANAJAHDY."  In response to the request, Instagram provided user-inputted account registration information as well as approximately ten login records that detailed the internet protocol ("IP") addresses and the dates and times they were used to login to the "NANAJAHDY" account.  Law enforcement in the United Kingdom conducted an online search of the IP addresses used to log in to "NANAJAHDY" and found that the IP addresses were connected to internet service in the United States.

        e.   In or about December 2020, law enforcement in the United Kingdom requested investigative assistance, through

Interpol, and the request was eventually sent to the HSI Cyber Crimes Center ("C3") in Fairfax, Virginia for dissemination to a local HSI field office.  C3 conducted an online search of the IP addresses Instagram reported were used to login to "NANAJAHDY." C3 was then able to determine that "NANAJAHDY" was accessed from the internet service assigned to the area within HSI Riverside's area of responsibility.

f.   On or about February 24, 2021, C3 sent investigative materials, as well as contact information for DC Smith, to HSI Riverside where this investigation was subsequently assigned to me.

g.   On March 17, 2021, I reviewed the information from C3 and contacted DC Smith to request copies of additional investigative materials which included DC Smith's video recordings of MINOR 1's phone.  I subsequently reviewed the materials.  While reviewing the subscriber information provided by Instagram, I learned that the "NANAJAHDY" was created on July 26, 2020 and was registered with the email address SKUMBOW@GMAIL.COM (the "SUSPECT EMAIL ACCOUNT").  Instagram also reported that "NANAJAHDY" was no longer an active account and was closed on August 24, 2020, at 20:30:10 (UTC).

h.   Login records provided by Instagram show that "NANAJAHDY" logged into Instagram eight times between August 8, 2020, and August 24, 2020, from the IP address 76.174.209.83 (

"SUSPECT IP 1"), and one time, on August 19[1], 2020, from the IP address 2607:fb90:4eed:c123:6595:0251:26cf:5e83 ("SUSPECT IP 2").

i.   On or about March 17, 2021, I conducted a search of SUSPECT IP 1 and SUSPECT IP 2 with the online IP address search tool Maxmind.com and learned that SUSPECT IP 1 is owned by Charter Communications and that SUSPECT IP 2 is owned by T-Mobile.

j.   On or about March 18, 2021, I sent a summons to Charter Communications and T-Mobile requesting subscriber information for SUSPECT IP 1 and SUSPECT IP 2.  In response, Charter Communications reported that from September 7, 2017, at 7:47 pm (UTC), until December 29, 2020, at 4:21 pm (UTC), SUSPECT IP 1 was assigned to Juan Mendoza at the SUBJECT PREMISES, i.e., 18470 Bohnert Avenue, Rialto, California 92377. On July 16, 2021, T-MOBILE responded to the summons and reported that from August 19, 2020, at 11:57:42 am (UTC) until 12:01:27 pm (UTC) the SUSPECT IP 2 was assigned to SUBJECT PHONE NUMBER 1 registered to Juan Mendoza at the SUBJECT PREMISES.  T-MOBILE also identified that the SUBJECT IP 2 was utilized by an iPhone XR (IMSI: 310260343427273).  T-MOBILE also reported that a

---

[1] On July 16, 2021, as described in greater detail below, I obtained a federal search warrant, Case No. ED CR 21-MJ-480, to search Snapchat accounts "CALI.REPTILES," "B_OVER7902," and "BEND9525."  In the affidavit in support of that search warrant, I mistakenly reported that "NANAJAHDY" was accessed from SUSPECT IP 2 on August 24, 2020, which is incorrect.  The correct date is August 19, 2020.  T-Mobile subscriber records detailed below showed that from August 19, 2020 at 11:57:42 am (UTC) until 12:01:27 pm (UTC), the SUSPECT IP 2 was assigned to SUBJECT PHONE NUMBER 1, registered to Juan Mendoza at the SUBJECT PREMISES.

second device was linked to Juan Mendoza's account, a Samsung A20 (IMSI 310260068637482).

**B.    Second Lead: Snapchat User "BEND9525" and "B OVER7902" Uploaded Child Pornography to Snapchat in May 2021**

25.   Snapchat, like Instagram, is a social media and instant messaging and video communication platform available via application on mobile devices.  Snapchat allows its users to post images and videos publicly and privately, as well as engage in text and live video communication in private one-on-one conversations and in a group setting with multiple Snapchat users.  These Snapchat features are permitted in private one-on-one conversations and in a larger "group" setting with multiple Snapchat users.  Snapchat is popular among its users because Snap Inc.'s servers are designed to automatically delete communications, including images and videos, once the recipient has opened the message and both the sender and recipient have left the chat screen.  Similarly, should a Snapchat user save or "screen shot" content (i.e., capture what appears on the mobile application screen on a mobile device) within the conversation, the participants in that Snapchat conversation are alerted and the Snapchat user who saves or screen shots is identified to others in the conversation.

26.   On or about May 2, 2021, NCMEC received information from Snap Inc., which identified Snapchat account "BEND9525" as uploading child pornography to the Snapchat communications platform.  Snap Inc. provided NCMEC with information about the incident which NCMEC subsequently catalogued as CyberTip

89713390 ("CT89713390").  The information provided by Snap Inc.
included user-inputted account registration information for
"BEND9525," a copy of the uploaded child pornography image, and
one login record showing that "BEND9525" was accessed from the
IP address 45.50.216.25 ("SUSPECT IP 3") on May 1, 2021.
Utilizing IP address geolocation tools readily available online,
NCMEC learned that SUSPECT IP 3 is owned by Charter
Communications and assigned to service the area in/around
Colton, California.

    27.  On or about May 11, 2021, NCMEC received information
from Snap Inc., which identified Snapchat account "B_OVER7902"
as uploading child pornography to the Snapchat communications
platform.  Snap Inc. provided NCMEC with information about the
incident which was subsequently cataloged as CyberTip 90041367
("CT90041367").  The information provided by Snap Inc. included
user-inputted account registration information for "B_OVER7902,"
a copy of the uploaded child pornography image, and one login
record showing that "B_OVER7902" was accessed from SUSPECT IP 3
on May 3, 2021.

    28.  On or about May 26, 2021, NCMEC provided CT89713390
and CT90041367 to HSI Riverside for further investigation where
they were subsequently assigned to me.  That same day, I
reviewed the contents of CT89713390 and CT9004137 and the
subscriber information for "BEND9525" and "B_OVER7902" and
learned the following.

    29.  CT89713390 reports that on May 2, 2021, at
approximately 07:08:32 am (UTC), "BEND9525" uploaded an image

depicting the sexual abuse of a minor to the Snapchat communications platform.  I reviewed the image and found it to depict a female adult performing oral sex on a prepubescent female minor's vagina.  The image is closely focused on the female adult's face and the child's vagina.  The female child is nude from the waist down and appears to be lying on her back on top of a light grey-colored bed spread.  The child's legs are lifted up exposing her vagina and anus to the camera.  The female adult's left hand is on the child's lower stomach and pelvis and the female adult's head and face are just over the child's vagina partially blocking the child's face from camera view.  The female adult is looking directly at the camera and is seen penetrating the child's vagina with her tongue.

30.  The user-inputted account registration information Snap Inc. provided for "BEND9525" shows that "BEND9525" was registered with the following information:

Email Address: SKUMBOWEW@GMAIL.COM

Date of Birth: 08/09/1996

Screen/Username: BEND9525

31.  The single login record Snap Inc. provided for "BEND9525" showed that it was accessed using SUSPECT IP 3 on May 1, 2021, at approximately 10:46:07 pm (UTC).

32.  CT90041367 reports that on May 3, 2021, at approximately 01:50 am (UTC), the user account "B_OVER7902" uploaded two child pornography images to the Snapchat communications platform.  I reviewed each image and found that

both images are the same image that "BEND9525" uploaded described above in Paragraph 28.

33.    The user-inputted account registration information Snap Inc. provided for "B_OVER7902" shows that the account was registered with the following information:

> Email Address: SKUMBOW@GMAIL.COM (the "SUSPECT EMAIL ACCOUNT")
>
> Date of Birth: 08/09/1996
>
> Screen/Username: B_OVER7902

34.    The single login record Snap Inc. provided for "B_OVER7902" showed that it was accessed using SUSPECT IP 3 on May 10, 2021, at approximately 6:33 pm (UTC).

35.    On or about May 26, 2021, I conducted an online search of SUSPECT IP 3 within Maxmind.com, which reported information consistent with that provided by NCMEC--that SUSPECT IP 3 is owned by Charter Communications and assigned to service the area in or around Colton, California.

36.    On or about May 26, 2021, I sent, via email, a redacted copy of the child pornography image described in paragraph 28 to NCMEC's Child Victim Identification Program ("CVIP").  I requested that CVIP review the redacted image to determine if the image depicts an identified child victim.

37.    On or about May 27, 2021, CVIP responded to my request and informed me that they reviewed the redacted image and found that the image contains a child victim who had been identified by law enforcement and documented under the series name "Mother Full 2021."

38.   On or about May 28, 2021, I sent a summons to Charter Communications requesting subscriber information for SUSPECT IP 3 for the dates and times it was used to login to "BEND9525" and "B_OVER7902."  In response to the summons, Charter Communications reported that from April 11, 2021, at 7:20 pm (UTC), until May 26, 2021, at 7:09 am (UTC), SUSPECT IP 3 was assigned to "Juan Mendoza" at the SUBJECT PREMISES.

39.   On or about May 28, 2021, I sent a summons to Snap Inc. requesting subscriber and IP address login information for "BEND9525" and "B_OVER7902."  On or about June 11, 2021, Snap Inc. responded to the summons.  Snap Inc. was not able to provide user-inputted account registration information for "B_OVER7902" but was able to for "BEND9525."  As for login records, Snap Inc. did provide them for both "B_OVER7902" and "BEND9525," which showed that in May 2021 both "B_OVER7902" and "BEND9525" were logged into numerous times from SUSPECT IP 3 as well as from IPv4[2] addresses belonging to T-Mobile.[3]

40.   On or about May 26, 2021, I conducted a search for individuals associated with the SUBJECT PREMISES within Accurint, an online research tool that hosts a vast collection of public and proprietary records such as consumer and credit

---

[2] IPv4 was the first version of IP and is a numeric addressing method used to identify devices on an online network. However, with the increased availability of digital devices with internet capability, the IPv4 system was at risk of not being large enough to accommodate the increasing number of online devices/users.  The IPv6 is an alphanumeric addressing method which permits the allocations of more than 1000 times more IP addresses than IPv4.

[3] I know from prior investigations that T-Mobile does not maintain customer logs for their IPv4 addresses.

bureau data, motor vehicle data, utility, real estate, and other business data.  I found records for approximately eight adults associated with the SUBJECT PREMISES including a Juan Mendoza, who is believed to be the account holder for the Charter Communications internet service at the SUBJECT PREMISES.  I also found records for "Kresimir MENDOZA," with the date of birth of 08/09/1996.  I noticed that Kresimir MENDOZA's date of birth is the same as that which was registered to "BEND9525" and "B_OVER7902."  Additionally, I found that a search within Accurint using the SUSPECT EMAIL ACCOUNT resulted in records associated with the same Kresimir MENDOZA.

41.  On or May 26, 2021, I searched for records with databases maintained by the California Department of Motor Vehicles ("DMV").  I found a valid California Identification Card (XXXX2191) issued to "Kresimir MENDOZA" at the SUBJECT PREMISES.  The photo depicted on Kresimir MENDOZA's identification card depicts a Hispanic male with brown hair and brown eyes.  I also found within DMV records California Driver's Licenses issued to Juan Mendoza and Irene Vasquez De Mendoza[4] at the SUBJECT PREMISES.

42.  On or about June 1, 2021, a search of Kresimir MENDOZA's social security number, within employment records maintained by the California State "Employment Development Department," showed that for the first quarter of 2021 (January, February and March), Kresimir MENDOZA was employed by the Target

---

[4] DMV records show that Irene Vasquez De Mendoza is also known as Irene Ponce Vasquez.

Corporation and that the SUBJECT PREMISES, and the SUBJECT PHONE
NUMBER 1 are on file with Kresimir MENDOZA's employment
information.

43.  On July 1, 2021, I spoke to Alex Verdejo, U.S.
Postmaster for Rialto, California, who informed me that he spoke
to the mail carrier assigned to deliver mail to the SUBJECT
PREMISES and confirmed that Juan Mendoza and Kresimir MENDOZA
receive mail at the SUBJECT PREMISES.  Postmaster Verdejo
informed me that as recently as that same day, July 1, 2021, the
mail carrier reported delivering mail to the SUBJECT PREMISES
addressed to Juan Mendoza and Kresimir MENDOZA.

C.  **Third Lead: Snapchat User "CALI.REPTILES" Induces a
    12-year-old Female, MINOR 2, in Canada to Produce
    Sexually Explicit Images of Herself**

44.  From my review of investigative reports written by DC
Cristobal Brea of the Hamilton Police in Ontario, Canada, as
well as communications I had with DC Brea, I learned the
following:

a.  On or about April 30, 2021, law enforcement in
Canada received a call from the mother of a 12-year-old female
("MINOR 2")[5] who reported that an unknown male, believed to be in
the United States, had been communicating with MINOR 2 on
Snapchat, persuaded MINOR 2 to produce sexually explicit images
of herself, and made threats to MINOR 2 to send more explicit
content.  MINOR 2's mother said she was initially made aware of

---

[5] MINOR 2's mother also reported that MINOR 2 has "Autism
Spectrum Disorder" and has poor memory recollection as a result.

the incident by her adult neighbor after MINOR 2 went to the neighbor's house to play with the neighbor's daughter ("MINOR 3"). MINOR 3 allowed MINOR 2 to briefly use her phone, after which MINOR 3 began receiving inappropriate text messages from the same adult male who had been communicating with MINOR 2.

      b.   In or about May 2021, DC Brea obtained statements from Minor 3's mother and from MINOR 2. Below are each of their statements as documented by DC Brea:

      i.   MINOR 3's Mother's Statement to DC Brea (with the names of MINOR 2 and MINOR 3 substituted as "MINOR 2" and "MINOR 3"):

| | |
|---|---|
| DC Brea: | What happened? |
| MINOR 3's Mother: | MINOR 2 had come over for a sleepover and her phone was dead. She asked MINOR 3 to use her phone, MINOR 3 said sure, and let her use the phone. She [MINOR 2] used the phone and it turned out to be a man she was talking to. MINOR 3 was under the impression that it was MINOR 2's boyfriend. MINOR 3's phone was at the kitchen table, and I saw a message with the name "asshole pedophile." I opened the phone and questioned her, and told MINOR 2's Mother after. I started talking to him on MINOR 3's phone trying to find out who he was. Then he said that he was |

|                  |                                                                                     |
|------------------|-------------------------------------------------------------------------------------|
|                  | going to ruin MINOR 2's life and ours, and expose her to the world.  He then told MINOR 2 to tell me to shut my mouth, and she said I can't she's an adult. He said don't worry ill make her shut her mouth. |
| DC Brea:         | Was there any specific threats?                                                     |
| MINOR 3's Mother:| No                                                                                  |
| DC Brea:         | How did you communicate with this person?                                           |
| MINOR 3's Mother:| He was messaging my daughter through her number but he was using an app. I tried calling back but he would hang up, and text back. He would just listen and text back. |
| DC Brea:         | What was the phone number?                                                          |
| MINOR 3's Mother:| (909) 550-3282 [SUBJECT PHONE NUMBER 1]. It said it was from Montana [sic] California. I think he was using a text app. I told him the police would get the number. He said he would expose MINOR 2 if I did. |
| DC Brea:         | What did his voice sound like?                                                      |
| MINOR 3's Mother:| I never spoke to him, he would just listen.                                         |
| DC Brea:         | When do you think this happened?                                                    |
| MINOR 3's Mother:| April 30th, 2021                                                                    |

DC Brea:                Anything you want to add?

MINOR 3's Mother:    No.

        ii.  MINOR 2's Statement to DC Brea (with the names of MINOR 2 and MINOR 3 substituted as "MINOR 2" and "MINOR 3"):

DC BREA:   Tell me what happened?

MINOR 2:   He texted me on Instagram about my bio and said that he liked thick girls. I started talking to him and he asked me for nudes so I blocked him on Instagram. Then he made a bunch of other accounts and I sent him a photo of me since he wouldn't leave me alone, it was an up close cleavage picture. He said that he would show all of my followers and he started asking me to do stuff that was sexual. He was just rude, I don't know what to say. He talked about getting me pregnant and started threatening me. I said no to everything and he started saying that he would rape my sister and stick his private part down her throat. He then said that he would kidnap both of us so I blocked him. He then contacted MINOR 3, then he sent me a video on Snapchat asking me to come out saying that he was outside my house. The video was of him walking past the house, I never came out. He started contacting MINOR 3 saying that he owns me and would get me pregnant. He then started threatening me through

her. He then asked my friend to show her boobs.
He then said that he wanted to fuck both of us.
He asked MINOR 3 to unblock him but it was him
just talking normally after. He told us to join
his call, and said he would expose her. He then
also sent a screen shot of him texting my sister.

DC BREA:  When did you start talking to this person and on
what platform?

MINOR 2:  It was Instagram, maybe a couple of months ago,
I'm not sure.

DC BREA:  What was his user name?

MINOR 2:  It was a Spanish name, I'm not sure.

DC BREA:  What was the username of the account on Snapchat?

MINOR 2:  Cali.Reptiles

DC BREA:  Did the person contact you on any other
platforms?

MINOR 2:  Facebook, as David Smith, there was no friends.

DC BREA:  Can you explain what videos or images you sent to
the suspect?

MINOR 2:  Images and videos of my vagina, and videos of me
masturbating. He also told me to stick things in
my vagina and to send it to him.

DC BREA:  Did you talk on the phone with this person and if
so what did they sound like?

MINOR 2:  Yes. Like a grown up guy with a Mexican or
foreign accent.

DC BREA:  How did you communicate on the phone?

MINOR 2:    Snapchat phone call.

DC BREA:    Did you ever see what this person looked like?

MINOR 2:    In his 30s, dark skinned, curly hair with a blonde streak through it. No facial hair. It was on Snapchat Face Time.[6] We face timed each other twenty times. One time there was another guy present who was white.

DC BREA:    Were you guys in a relationship?

MINOR 2:    No I told him I was twelve and couldn't be his girlfriend.

DC BREA:    Did he know your age before you sent the photos?

MINOR 2:    He didn't know in the beginning. I had already sent him photos beforehand, I told him after and he started blackmailing me by asking for sexually explicit photos. I then sent him images of my vagina, ass and boobs.

DC BREA:    Did this person ever say where they were?

MINOR 2:    He said he was in America.

DC BREA:    Did he send you any images or video?

MINOR 2:    He sent me a video of his penis, and video of him having sex with his girlfriend.

DC BREA:    What did his girlfriend look like?

---

[6] "FaceTime" is a proprietary application developed by Apple that allows Apple devices to communicate via video call. However, the term "Face Time" is commonly used to describe video calls on any platform, not just those occurring on the Apple "FaceTime" application. Numerous social media and messaging applications, such as Snapchat, have developed video call capabilities within their application and I know from prior investigations that such video calls are often referred to as "Face Time" as well.

MINOR 2:    She was Latina, long black hair, chubby with
            bushy eyebrows. She was maybe like 23.

DC BREA:    When did he send you the video outside your house
            when he asked you to come out?

MINOR 2:    About three weeks ago.

DC BREA:    Tell me about the threats the suspect made and on
            what platform?

MINOR 2:    On Snapchat and Instagram. He basically said that
            he would expose me. He said that he would kidnap
            me and my friend, and rape my sister.

     c.    On or about May 12, 2021, at the conclusion of
obtaining MINOR 2's statement, MINOR 2 provided her phone to DC
Brea and consented to its examination for relevant data.  DC
Brea conducted a cursory search of the phone and found within
the phone's "camera roll" images of screen captures taken of
various Snapchat conversations that occurred with
"CALI.REPTILES."  Canadian law enforcement subsequently
extracted data from MINOR 2's phone with Cellebrite – a forensic
application used to extract data from mobile devices.

     d.    That same day, May 12, 2021, DC Brea made an
emergency request to Snap Inc., to produce subscriber
information and login records for "CALI.REPTILES."  Snap Inc.
responded to the request the following day on May 13, 2021.
Snap Inc. provided account information and login records between
May 9, 2021, at 20:55:00 (UTC), and May 12, 2021, at 20:55:00
(UTC).  I reviewed the information provided by Snap Inc. and
found that "CALI.REPTILES" was created on November 2, 2019, at

19:00:17 (UTC) using IP address
2605:e000:ad1a:c300:fc91:542f:fad6:e9bf.  No email address and
phone number were registered to the account at the time Snap
Inc. provided the information.  Snap Inc. provided a total of
three IP address login records that showed "CALI.REPTILES" was
accessed from SUSPECT IP 3 on May 10, 2021, at 18:33:25 (UTC)
and on May 11, 2021, at 13:23:35 (UTC).  The third login record
was from IP address 65.246.71.66 on May 11, 2021, at 11:45:01
(UTC).

          e.   DC Brea conducted an online search of the IP
addresses used to create and login to "CALI.REPTILES" and found
that SUSPECT IP 3, 2605:e000:ad1a:c300:fc91:542f:fad6:e9bf, and
65.246.71.66[7] resolve to the internet service in Southern
California.

          f.   On or about May 13, 2021, DC Brea returned MINOR
2's phone to MINOR 2 and her mother.  DC Brea asked MINOR 2 and
her mother to send DC Brea an image of the individual who
induced MINOR 2 to send sexually explicit images, if such an
image was obtained during a "FaceTime" call and only if MINOR 2
and her mother were absolutely certain that the image was of the
individual that MINOR 2 communicated with and provided sexually
explicit images.

---

[7] On or about July 6, 2021, I issued a summons to Verizon
Internet Service, the internet service company that owns IP
address 65.246.71.66, and requested subscriber information
relating to that IP address for the date and time it was used to
login to CALI.REPTILES.  In response, Verizon reported that the
internet service is owned by the Target Corporation-Kresimir
MENDOZA's employer.

g.    Later that same day, on May 13, 2021, DC Brea received an email from MINOR 2's mother who stated, "Here is the picture of the guy."  The email contained an attached image which I have reviewed.  That photo appears to be a screenshot taken using a mobile device.  The photo is a close-up of a Hispanic male adult's face.  The male adult appears to be wearing a dark-colored hoody and only his face is exposed to the camera.  I looked at the person in the photo and found that it appeared to be the same person in the California Identification Card issued to Kresimir MENDOZA at the SUBJECT PREMISES.

h.    On or about May 25, 2021, MINOR 2 emailed DC Brea various screen captures she made documenting communications with the suspect.  Included in these screen captures were various Snapchat communications between her and "CALI.REPTILES," as well as a picture of a photo that is believed to be the suspect sending two messages, via Instagram, to MINOR 2's older sister. The messages state, "Heyy" and "Your sister is sending nudes."

i.    On or about May 25, 2021, DC Brea reviewed the information extracted from MINOR 2's phone using Cellebrite. During that search, DC Brea found evidence supporting communication with "CALI.REPTILES" and as well as approximately 19 phone call records that took place between April 28, 2021, and April 30, 2021.  I reviewed the call records and found that the calls were made to and from an individual using the name "CALI.REPTILES" and/or directly using SUBJECT PHONE NUMBER 1. Of the 19 call records, approximately 13 of them were connected

and ranged in duration from as short as 5 seconds in length to as long as 5 minutes and 37 seconds.

       j.   I also reviewed the screen captures DC Brea saved during his Cellebrite review of MINOR 2's phone.  There were approximately 24 in total.  They primarily depict portions of Snapchat communications MINOR 2 had with "CALI.REPTILES."  The screen captures did not have date or time stamps identifying when the conversation occurred, and they did not appear to be in any identifiable order.  In reading the communications, I found instances in which "CALI.REPTILES" solicited MINOR 2 for sexual images of herself; threatened to "expose" MINOR 2 by sharing images with others such as her sister, and even acknowledged that MINOR 2 was 12 years old.  There also were communications where "CALI.REPTILES" stated that he "owns" MINOR 2 and had sold her images to another person.  As an example of some of the communications I have described five of them in more detail below:

          i.   <u>Screen Capture 1:</u>

      CALI.REPTILES: Record your ass

                      Ok?

      MINOR 2:      Ok

      CALI.REPTILES: Take your underwear off (smiling closed

                      eyes emoji)

      MINOR 2:      I don't want to

      CALI.REPTILES: DO IT

                      listen to your man

      MINOR 2:      how about

NO

CALI.REPTILES: Do it or your sister will be texted

    ii.  Screen Capture 2:

CALI.REPTILES sent an image depicting a screen capture of MINOR 2 Sister's Instagram profile and then sent the following messages:

CALI.REPTILES: You unfriend me again and you're

                  getting exposed

                  Got it?

MINOR 2:        Ok

    iii.  Screen Capture 3:

MINOR 2:        Why did you sell my pics though

                  ?

CALI.REPTILES: He was the one that asked tf[8]

                  I was like tf

MINOR 2:        Why did you do it though

                  (Crying face emoji)

CALI.REPTILES: Because he wanted to see

                  And you have a nice ass body so what

                  was I just supposed to say sure here

                  they are free?

                  Tf

MINOR 2:        Just say no

---

[8] I know from prior investigations that "TF" is an acronym used commonly in text or chat communications to mean "The Fuck?"

CALI.REPTILES: Like I said whatever he wanted to see
you and I was like why not like she
showed me

    iv.  Screen Capture 4:

MINOR 2:      Oh ok

CALI.REPTILES: You better make me cum rn[9]

MINOR 2:      Why

CALI.REPTILES: Because I own you
Now do it

MINOR 2:      But I don't want toooo

    v.  Screen Capture 5:

MINOR 2:      No you're just obsessed with my body

CALI.REPTILES: Ok fine I love your body
Happy?

MINOR 2:      I'm only 12 you don't care about that

CALI.REPTILES: No I don't

45. On or about May 25, 2021, DC Brea made arrangements to refer the investigation of "CALI.REPTILES" to HSI Riverside via HSI Toronto.

**D.**  **Search Warrant Executed on Snapchat Accounts "CALI.REPTILES," "B OVER7902," AND "BEND9525"**

46. On July 16, 2021, I obtained a federal search warrant, Case No. ED CR 21-MJ-480, to search Snapchat accounts "CALI.REPTILES," "B_OVER7902," and "BEND9525" ("SNAP SEARCH

---

[9] I know from prior investigations that "RN" is an acronym used commonly in text or chat communications to mean "Right now."

WARRANT"). Later that same day I executed the SNAP SEARCH
WARRANT, via email, to Snap Inc.

47. On or about July 26, 2021, Snap Inc. responded and
emailed me a hyperlink to a downloadable file containing account
information responsive to the SNAP SEARCH WARRANT. I reviewed
the information provided by Snap Inc. which contained
approximately 2.1 gigabytes of data. In reviewing the data, I
found that the production of account data was partially
incomplete. I found that the images and videos contained in the
"Memories"[10] of accounts "BEND9525" and "CALI.REPTILES" were
missing GPS coordinate data. Snap Inc. provided the latitude
coordinate/s for each recorded image and video in "Memories" but
appeared to omit the longitude coordinate/s data. That same
day, I emailed Snap Inc. and inquired as to why the data was
missing.

48. On or about August 12, 2021, I received an email from
Snap Inc. informing me that they regenerated the entire
production of data. Snap Inc. provided another hyperlink which
I used to successfully download the data. This production of
data was approximately 2.7 gigabytes of data and did contain the
GPS coordinate data the was previously omitted. Snap Inc. did
not provide an explanation as to why the GPS data was incomplete
in their first production of data.

49. On or about August 12, 2021, I began reviewing the
data provided by Snap Inc. I reviewed the IP address login

---

[10] "Memories" are saved images and videos that were recorded
using the Snapchat application and saved to the user's Snapchat
account.

records for each of the accounts, "BEND9525," "B_OVER7902," and "CALI.REPTILES," and found that all three were logged into on multiple occasions from IP addresses previously identified by Charter Communications as being assigned to the internet service at the SUBJECT PREMISES.

50.  With respect to accounts "BEND9525," and "CALI.REPTILES," I found that these two accounts contained numerous video-recorded "Memories."  However, the account "B_OVER7902" did not have any.  Snap Inc. provided copies of the image and video recorded "Memories" as well as information detailing the dates and times when the "Memories" were recorded and the GPS coordinates detailing the location where the "Memories" were recorded.  I reviewed each of the 144 video-recorded "Memories," approximately 68 were saved to the "BEND9525" account, and approximately 76 were saved to the "CALI.REPTILES" account.  The majority of video recordings are short in length, approximately 10 seconds long, and depict closeups of various fish swimming in an aquarium like those found in someone's home.  I found that all 144 video-recorded "Memories" were recorded between October 6, 2020, and April 29, 2021.  In some of the recordings of the aquarium, a reflection is visible in the glass, and it appears that the video is being recording using an iPhone 11 model or newer.  Similarly, some of the videos show an adult's hand feeding the fish inside the aquarium.  I reviewed the GPS coordinate information for each of the recorded "Memories" and using the online mapping tool Google Maps, I learned that all but one of the recordings contained GPS

coordinates showing that it was recorded at, or within a few feet, of the SUBJECT PREMISES.  Additionally, while reviewing the video recorded "Memories" saved to the "CALI.REPTILES" account, I found two videos of significant relevance.  Both videos were recorded on October 6, 2020, at approximately 12:41 pm (UTC).  The two videos depict a nude Hispanic male adult recording himself masturbating.  The camera is closely focused on the male adult's penis.  However, during one of these two videos, the male's face is clearly visible and appears to be the same person depicted on MENDOZA's California Identification Card.

51.  I reviewed the communications provided by Snap Inc. and found that while "CALI.REPTILES" and "B_OVER7902" contained numerous communications, "BEND9525" only contained one which was the child pornography image referenced in CT89713390 and described in Paragraph 28.  The communications provided by Snap Inc. for "CALI.REPTILES" and "B_OVER7902" show that MENDOZA used these two accounts to sell child pornography as well as to engage in sexually explicit conversations with minors or engage in sexually explicit conversations about minors with other suspected adults.  Often times the conversation MENDOZA had with minors resulted in MENDOZA making violent threats towards the minor/s which included threats of going to their house to rape them and get them pregnant.  I also found communications within "CALI.REPTILES" where MENDOZA sent the Snapchat user "LB69"[11] a

---

[11] The actual username for "LB69" has been redacted because it is unknown if the user of this account is a minor or an adult.

screen capture of his payroll deposit from his employer Target
Corp.  The screen capture shows that the payment from Target
Corp. was addressed to Kresimir MENDOZA.  Below are a few
examples of such communications.

       1.   <u>Mendoza uses "B OVER7902" to sell child
              pornography depicting MINOR 2 to "SUSPECT A"</u>

52.  The following conversation between MENDOZA (aka
"B_OVER7902") and "SUSPECT A"[12] occurred on May 3, 2021.  The
earliest portion of that conversation provided by Snap Inc. is
detailed below, however, it appears that the two communicated
previously judging from how the conversation begins.  During
this conversation, MENDOZA appears to utilize the persona of
MINOR 2 and offers to sell SUSPECT A sexually explicit images
and or videos of MINOR 2 as if he is her.  In total,
approximately $20 were sent to MENDOZA via Cash App[13] in exchange
for four videos and one image depicting MINOR 2.  Below is the
entire conversation provided by Snap Inc.[14]:

        B_OVER7902:    Send it to

---

[12] The actual username for "SUSPECT A" is known to law
enforcement but is being anonymized in order to protect the
ongoing investigation.

[13] Cash App is an application that allows individuals to
send and receive money like Venmo, PayPal and Zelle which are
more popular versions of the same types of service.  Cash App
has its users create a what is called a "CashTag" which
functions like a username.  The "CashTag," which begins with the
symbol "$" is all that is needed to send money to a specific
Cash App user's account.

[14] Snap Inc. provides user's communications in Microsoft
Excel format which is unable to display many of the "Emojis"
that are available for users on the Snapchat application.  When
a user utilizes an Emoji, Excel often will display that data in
undecipherable text and characters such as "âŸŸ" and "ðŸ˜˜".
Therefore, in communications detailed below, when Emojis appear
to have been used I have replaced that data with "[EMOJI]"

                          $skumbow

                          $10

SUSPECT A:          On cashapp?

B_OVER7902:         Yup

                          Send $10

    53.   SUSPECT A sent MENDOZA a screen capture of a
payment confirmation from Cash App to "$Skum Bow" in
the amount of $10.

SUSPECT A:          There

B_OVER7902:         What do you want?

                          Videos or pictures?

SUSPECT A:          Videos

B_OVER7902:         Ok

SUSPECT A:          Ok

                          ?

B_OVER7902:         Hold on

                          It's sending

SUSPECT A:          Ok

                          Probably scamed me right?

    54.   MENDOZA then used his "B_OVER7902" account to send
SUSPECT A one video depicting MINOR 2 sucking on a pink and
black colored hairbrush handle. Occasionally MINOR 2 is seen
sticking the handle deep into her own throat.

B_OVER7902:    Hahaha I never scam

    55.   MENDOZA then used his "B_OVER7902" account to send
SUSPECT A one video depicting MINOR 2 from behind.  MINOR 2 is

nude and is seen moving her body up and down mimicking a sex
act.

    B_OVER7902:  Want to buy more?

             I sent two

    SUSPECT A:  Lol what else u sell?

    B_OVER7902:  Playing with my pussy

             With the brush

 56. MENDOZA then used his "B_OVER7902" account to send a
photo to SUSPECT A depicting a close up of a what appears to be
MINOR 2's open mouth with a white fluid dripping down her chin.
The photo is closely focused on MINOR 2's mouth.

    SUSPECT A:  Sure

             What else?

    B_OVER7902:  That's it

             Just boob pics ass pics pussy videos

    SUSPECT A:  Ok

    B_OVER7902:  Interested?

 57. SUSPECT A sent MENDOZA a screen capture showing
another payment confirmation from Cash App to "$Skum Bow" in the
amount of $10.

    SUSPECT A:  Yea sent it

    B_OVER7902:  What do you want?

    SUSPECT A:  The video

    B_OVER7902:  Of?

             Me playing with the brush ?

    SUSPECT A:  Yea

             Wanna be friends?

    B_OVER7902: Ok I'll send it

    SUSPECT A:  Ok

58. MENDOZA then used his "B_OVER7902" account to send SUSPECT A two videos each depicting MINOR 2 penetrating her vagina with the pink and black colored hairbrush handle.  The camera is closely focused on MINOR 2's vagina.

    B_OVER7902: I sent 2

    SUSPECT A:  Ok lol

    B_OVER7902: If you want to buy let me know

           If you want to buy more

           Ok?

           Interested in more?

    SUSPECT A:  I'll buy more later

    B_OVER7902: Ok

           I look -8?

59. Do you like little girls too bro [EMOJI],

  2. <u>MENDOZA uses "B OVER7902" to advertise child pornography for sale to SUSPECT B and disclosed his plan to kidnap and rape a coworker and a 15-year-old (MINOR 4)</u>

60. The following conversation between MENDOZA (aka "B_OVER7902") and "SUSPECT B"[15] began on May 3, 2021, and concluded May 11, 2021.  The conversation began with MENDOZA attempting to sell a child pornography video depicting a prepubescent female, a screenshot from the video was sent to SUSPECT B.  However, SUSPECT B informed MENDOZA that Cash App

---

   [15] The actual username for "SUSPECT B" is known to law enforcement but is being anonymized in order to protect the ongoing investigation.

did not work in his country and no purchase of child pornography appears to have been made.  However, the conversation between the two continued and eventually developed into a conversation where MENDOZA details his plans to kidnap and rape a female coworker at knife point and force her to drive him to Texas so he could also kidnap and rape a 15-year-old female (identified as "MINOR 4").  MENDOZA tells SUSPECT B how he will force the female coworker to drive him and MINOR 4 to Mexico where the "Government" could not get him.  Below is a portion of the conversation which began on May 3, 2021:

| | |
|---|---|
| B_OVER7902: | Want to buy the video? |
| SUSPECT B: | You sure you're not a trap [EMOJI] … can I get one final screen so I know? |
| B_OVER7902: | Ya hold on |

61.  MENDOZA then used his "B_OVER7902" account to send SUSPECT B one photo depicting a close up of a nude female, who appears to be prepubescent, laying back touching her vagina with her hand.  The camera is focused closely on the child's vagina.

| | |
|---|---|
| SUSPECT B: | Do you like little girls too bro [EMOJI] , |
| B_OVER7902: | Yup |
| | You want to buy the video? |
| SUSPECT B: | Still thinking about it... does it make me a pedophile? |
| B_OVER7902: | Yup but who isn't |
| | Haha |
| SUSPECT B: | Ok |

B_OVER7902:     So you interested?

SUSPECT B:      Yep

B_OVER7902:     Ok here is my cash app

                $skumbow

                Send $10 and I'll send the video

                You'll love it

SUSPECT B:      Cash app doesn't work in my country

                [EMOJI] … I tried

B_OVER7902:     Omg

SUSPECT B:      What's the thing in your collection you

                like the most?

                Eum sorry to bother you but... is it

                normal that I feel like I'm going to be

                arrested [EMOJI] …

62.   The conversation continues between MENDOZA and SUSPECT B and they discuss their attempts to persuade minors they have met online to send them nude images and videos.  The conversation then develops into MENDOZA discussing his plan to kidnap and rape a coworker and a 15-year-old female in Texas. A portion of that conversation, which began on May 10, 2021, is detailed below:

B_OVER7902:     This girl Is at my job

63.   MENDOZA then used his "B_OVER7902" account to send SUSPECT B one photo of a clothed adult female sitting at a table with her back to the camera. The female is sitting next to a large commercial refrigerator and is wearing what appears to be

a badge clipped to her left sleeve.  She is unaware that she is
being photographed.

       B_OVER7902:     I feel like kidnapping her

                      [EMOJI]

                      She has an ass lol

       SUSPECT B:      She looks tired let her rest at your

                      house [EMOJI]

       B_OVER7902:     I was going to do it today lol

                      But she didn't go out on break so I

                      couldn't force her in her car

       SUSPECT B:      Man if the police is about to get you

                      give me all your collection then delete

                      me [EMOJI] ,

       B_OVER7902:     Nahh I have a plan

                      When I kidnap her I'll taker her to

                      Mexico

                      There she's all mine

                      [EMOJI]

   64.  MENDOZA then used his "B_OVER7902" account to send
SUSPECT B two photos of the same female sitting at the small
desk by the refrigerator, again, she does not appear to know
that she is being photographed.

       B_OVER7902:     And that's not all

       SUSPECT B:      Niice what's more

65.  MENDOZA then used his "B_OVER7902" account to send a short video depicting MINOR 4 dancing to music[16].

B_OVER7902:     Remember her?

SUSPECT B:      Yuup

                Is she In your basement already?

B_OVER7902:     Watch the video lol

                It's loading

66.  MENDOZA then used his "B_OVER7902" account to send SUSPECT B another short video depicting MINOR 4 dancing to music.  In this video MINOR 4 turns her back to the camera showing her clothed back and buttocks to the camera.[17]

SUSPECT B:      Big ass [EMOJI]

B_OVER7902:     I know

                So here's my plan

                You seen the first girl from work?

SUSPECT B:      Yep

B_OVER7902:     So I'll kidnap her and make her drive me to that 15 year olds house

                And kidnap her too

                And take them to Mexico where the government won't touch me

                [EMOJI]

---

[16] I conducted a search online within social media platform Instagram and found an account belonging to MINOR 4 where this video was publicly available to view.

[17] I conducted a search online within social media platform TikTok and found an account belonging to MINOR 4 where this video was publicly available to view.

|              |                                              |
|--------------|----------------------------------------------|
|              | I'll fuck both of them                       |
|              | Lol                                          |
| SUSPECT B:   | Are you close to the border?                 |
| B_OVER7902:  | Yup                                          |
|              | But she lives in Texas                       |
|              | So I'll make the other girl from work        |
|              | take me to Texas for the 15 year old         |
|              | Then make her take us to Mexico              |
|              | [EMOJI]                                       |
|              | I mean Arizona lol                           |
| SUSPECT B:   | Why make her instead of yourself?            |
|              | [EMOJI]                                       |
| B_OVER7902:  | Because I won't drive lol                     |
|              | Plusss                                       |
|              | If she goes outside for break tomorrow       |
|              | I'll kidnap her                              |
|              | I'm for reals too                            |
|              | I'll go behind her when she goes to her      |
|              | car and pull a knife out on her and          |
|              | tell her to get in and drive or I'll         |
|              | stab her ass                                 |
|              | Then guess what?                             |
|              | [EMOJI]                                       |

67.  MENDOZA then used his "B_OVER7902" account to send
SUSPECT B one photo of the female worker sitting at the small
table next to the refrigerator.  This appears to be one of the
same photos MENDOZA sent previously.

```
B_OVER7902:      You see her?

SUSPECT B:       Yeah?

B_OVER7902:      I'm going to fuck her in her car
                 [EMOJI]

SUSPECT B:       But if she screams?

B_OVER7902:      Screams when I fuck her?
                 Or when I pull the knife out?

SUSPECT B:       Or when you treat her

B_OVER7902:      Huh?
                 Treat?

SUSPECT B:       Hold on..

B_OVER7902:      What do you mean if she screams?

SUSPECT B:       If she screams for help when you
                 threaten her

B_OVER7902:      She won't unless you want to get
                 stabbed you think she's that dumb?
                 [EMOJI] ,
                 She*
                 Unless she wants to get stabbed lol

SUSPECT B:       Plus [EMOJI] ,
                 No plus [EMOJI] ,

B_OVER7902:      You think she will?

SUSPECT B:       In her place I would for her whatever
                 is waiting in the car will be worse
                 than a little stab

B_OVER7902:      Huh?
                 What ?
```

|  | Say that again lol |
|--|--|
|  | I don't understand what you said |
| SUSPECT B: | Sorry I just woke up [EMOJI] … |
|  | I would scream for help and risk getting stabbed instead of getting in the car |
| B_OVER7902: | She has a family like kids she wouldn't risk dying |
|  | She's not that dumb |
| SUSPECT B: | Ok |
| B_OVER7902: | You want to see me fucking her |
| SUSPECT B: | Yuuup |
| B_OVER7902: | If she goes outside for break? |
|  | Because that's when I'll do it |
|  | Once she's drives far from work I'll fuck her |
| SUSPECT B: | Yeah man I want to see you fuck them both [EMOJI] |
| B_OVER7902: | I'll fuck the older one first lol |
|  | I'll make her my bitch |
|  | And I'll get both of them pregnant |
| SUSPECT B: | Do you have a gun? |
| B_OVER7902: | Nahh but I know she won't scream if I pull I knife out |
|  | Because it's she gets stabbed to death or she drives and does what I say |
|  | And I know she wants to live |

```
SUSPECT B:      Yeah but you'll have two girls to keep
                in check if one of them tries to run
                and you go after her the other will be
                alone

B_OVER7902:     They will be tied up
                Once I get the 15 year old I'll tie her
                up
                Then I'll take them both to Mexico
                And once they go there there's no
                coming back
                Everyone knows that
                [EMOJI]

SUSPECT B:      Ohh man I love your plan [EMOJI]
```

3.    <u>MENDOZA uses "CALI.REPTILES" to sell child
      pornography depicting MINOR 2.</u>

68.   As referenced in Paragraph 43(j)(3) above, images
recovered from MINOR 2's phone show screen captures of Snapchat
communications between her and MENDOZA, who was using his
"CALI.REPTILES."  During those communications MENDOZA admits to
selling nude images depicting MINOR 2.  Those communications,
and many more that occurred between MENDOZA and MINOR 2 were
recovered and provided by Snap Inc. pursuant to the SNAP SEARCH
WARRANT.  I reviewed these communications and found in that
conversation there are references to the Snapchat user, who is
identified as "SUSPECT C,"[18] who is the person MENDOZA sold nude

---

[18] The actual username for "SUSPECT C" is known to law
enforcement but is being anonymized in order to protect the
ongoing investigation.

images of MINOR 2 to.  I conducted a search for SUSPECT C within the information provided by Snap Inc. pursuant to the SNAP SEARCH WARRANT and found that MENDOZA used "CALI.REPTILES" to communicate with SUSPECT C between April 15, 2021, at 6:37 am (UTC) until April 16, 2021, 4:56 am (UTC).  During that conversation, I found communications where SUSPECT C paid MENDOZA $10, on more than one occasion via Cash App, in exchange for sexually explicit content depicting MINOR 2.  Snap Inc. did not provide the images or videos of MINOR 2 that MENDOZA sent to SUSPECT C, possibly because they were not saved to the conversation by either MENDOZA or SUSPECT C, and/or they were automatically deleted from the conversation once they were viewed, which is how Snapchat functions by design.  However, the conversation between MENDOZA and SUSPECT C contain descriptions of the images and videos in enough detail to allow the reader to understand that they are consistent with the sexually explicit images and videos MINOR 2 sent to MENDOZA.  Additionally, during the same conversation, SUSPECT C disclosed to MENDOZA that he is sexually attracted to his own daughter and wants to perform oral sex on her. Below is a portion of the conversation which occurred on April 15, 2021:

> CALI.REPTILES: You wanna buy her nudes?
>
> SUSPECT C:     What city. Im in corona
>
> Lol. Hey if ur like 19 and shes 12 thats cool by me. Lucky lol
>
> Yea. Can u shoot me a full body pic of her. Wanna see those tits are hers

```
CALI.REPTILES: Ok wait

SUSPECT C:      K

CALI.REPTILES: She's gonna send it to me rn[19]

SUSPECT C:      Ok

                U fuckin her too??

CALI.REPTILES: I wish

SUSPECT C:      I bet.  Why not.

CALI.REPTILES: She lives too far[20]

SUSPECT C:      Awww yea that sux

CALI.REPTILES: How much you trying to pay to see all
                of her tho?

SUSPECT C:      Well. What all u have. Pics n videos

CALI.REPTILES: I have videos of her fucking herself[21]

CALI.REPTILES: And her deepthroiting[22]

SUSPECT C:      Ok. Nice

                Oh wow. Love it

CALI.REPTILES: Ok I'll show you she sent me one

SUSPECT C:      K
```

---

[19] At this time during the conversation with SUSPECT C, MENDOZA was communicating on Snapchat simultaneously with MINOR 2 and asked her "Show me your boobs again…And show your face too".  In response to his request MINOR 2 appears to comply although no image was saved or recovered by Snap Inc. pursuant to the SNAP SEARCH WARRANT.

[20] At this time during the conversation with SUSPECT C, MENDOZA knows MINOR 2 resides in Canada.

[21] MENDOZA previously obtained videos of MINOR 2 sticking a hairbrush handle into her vagina.

[22] MENDOZA previously obtained videos of MINOR 2 sticking a hairbrush handle deep into her throat.

CALI.REPTILES: See she got fat ass tits[23]

SUSPECT C:    And shes 12[24]?   Be honest.   Shes 12?

CALI.REPTILES: Ya I can't believe it either

SUSPECT C:    Lol

              Ok. How bout $10 for a few pics and a
              video. Then well go from there

CALI.REPTILES: Ok deal

              You trying to see a video of her
              fucking herself of her doing
              deepthrout?

SUSPECT C:    Deepthroat

              Some pics too

CALI.REPTILES: Ok and what kind of pictures?

              Her ass her boobs?

SUSPECT C:    Pussy.   Full body. If u have it

CALI.REPTILES: I don't have a pull body

              Just her boobs her ass and her pussy

SUSPECT C:    Ok

CALI.REPTILES: Ok you have cash app?

SUSPECT C:    Yes

CALI.REPTILES: Send me your username

SUSPECT C:    Whats urs. I dont even remember mine.

CALI.REPTILES: $SkumBow

SUSPECT C:    U got it!!

---

[23] Nude images depicting MINOR 2 show that she had breast
development.

[24] At this time during the conversation with SUSPECT C,
MENDOZA knows that MINOR 2 is 12 years old.

```
CALI.REPTILES: Ya I'll show you

               Hold on

SUSPECT C:     I saw confirmation.

               Im ready

CALI.REPTILES: Ok

               Hold on I'll send the pictures rn

SUSPECT C:     And vid

CALI.REPTILES: Ok

               Here's the video

SUSPECT C:     That should be our cocks

               She dont look 12 but shes hott

               U have vid of her bangin her pussy

CALI.REPTILES: Yup I do

SUSPECT C:     Sweet

CALI.REPTILES: She gave me her address too I can go

               fuck her when I want to

               You want to buy more? [EMOJI] …

SUSPECT C:     U should go

               How many vids u got

CALI.REPTILES: A lot

SUSPECT C:     Sweet.  I will send another $10. U send

               them

CALI.REPTILES: All of them?

               Ok I'll send you the ones she sent me

SUSPECT C:     K

CALI.REPTILES: But I have others if you wanna buy them

               too later
```

```
SUSPECT C:      Ok.  Other vids of her or other girls

CALI.REPTILES: Same girl

SUSPECT C:      Ok

                Sending money now

CALI.REPTILES: Ok

SUSPECT C:      Sent

CALI.REPTILES: Let me fine the one of her fucking

                herself hold on

                Her pussy is tight look

SUSPECT C:      Wish my daughter would do this

CALI.REPTILES: Wtf lol

                Wanna buy more I have a video you'll

                like

SUSPECT C:      My daughter is hott. I wanna see her

                nude lol

                Love that furry pussy

CALI.REPTILES: Your daughter? Cool

SUSPECT C:      What kinda vid is it

                Yes my kid

                Shes 13

CALI.REPTILES: Of her pretending she's getting fucked[25]

                You see all of her naked

SUSPECT C:      Nice

CALI.REPTILES: And her fucking herself with a brush
```

---

[25] At this time during the conversation with SUSPECT C, MENDOZA had already received a video from MINOR 2 depicting her nude and bouncing up and down mimicking as if she is engaging in a sex act.

SUSPECT C:        Ok. Send them and ill send a little
                  more after.

                  U got $20 already

CALI.REPTILES:    Ok

                  That ass tho haha

SUSPECT C:        Oh man. She needs to be bouncing off ur
                  cock

CALI.REPTILES:    Wait you said you wanna see your
                  daughter naked?

SUSPECT C:        Yes

                  I do

CALI.REPTILES:    What does she look like?

SUSPECT C:        A lil cutie

CALI.REPTILES:    Um show me a picture
                  Of her

SUSPECT C:        K

CALI.REPTILES:    No way[26]

SUSPECT C:        Sexy huh

CALI.REPTILES:    Brag I can get her nudes if you want
                  [EMOJI] …

                  Brah*

---

[26] It appears from the conversation that SUSPECT C sent a
picture of his daughter to MENDOZA although it was not provided
by Snap Inc. in response to the SNAP SEARCH WARRANT.  However,
in a conversation with MINOR 2 that occurred approximately 1.5
hours after this communication with "SUSPECT C," MENDOZA told
MINOR 2 that "he [SUSPECT C] wants to fuck his daughter."
MENDOZA then sent MINOR 2 a photo, which was recoverable and
provided by Snap Inc.  The photo MENDOZA sent MINOR 2 depicts a
female minor, appearing to be approximately 13 years old,
wearing a bikini standing by a pool.  MENDOZA then sent a
message to MINOR 2 stating "SUSPECT C said that's her."

```
SUSPECT C:      Idk. Shes a goody goody. Rarely online.
                Always reading n shit
CALI.REPTILES:  Um I can get them
                You want me to get her nudes?
SUSPECT C:      Lol
                She loves money. I think im just gonna
                say hey can dad see u naked for $300. I
                wont touch u i just wanna see ur body
CALI.REPTILES:  Don't lol
SUSPECT C:      Anymore vids of ur girl??
CALI.REPTILES:  I can get them without you getting in
                trouble trust me
SUSPECT C:      I will think about it
CALI.REPTILES:  Ok just saying I can maker her do
                anything too
                Make*
SUSPECT C:      K
CALI.REPTILES:  You want that?
SUSPECT C:      I think about it
                For now ill just look at ur vids
CALI.REPTILES:  Ok let me know and I'll get her nudes
                fast add
```

4.   MENDOZA uses "CALI.REPTILES" to threaten 13-year-
     old MINOR 5 with rape and pregnancy

69.   The communications between MENDOZA (aka
"CALI.REPTILES") and 13-year-old female "MINOR 5"[27] begin on
October 2, 2020 and continued through to October 24, 2020.
During that conversation MENDOZA makes numerous threats to MINOR
5 including going to her house to rape her and get her pregnant.
A portion of that conversation is detailed below and began on
October 2, 2020, at 6:22 pm (UTC):

       CALI.REPTILES: You love me right?

       MINOR 5:       I-

                      Yeah but that's weird.. I'm 13 n ur 24

       CALI.REPTILES: Sooo? Lol that's better for you want yo
                      know why?

       MINOR 5:       Why

       CALI.REPTILES: First of all because I'm older I won't
                      play games

                      So it will be a serious relationship

                      No playing around

                      Younger guys play around

       MINOR 5:       Yeah Ik

       CALI.REPTILES: Like I'm pretty mature

                      Don't you like that?

       MINOR 5:       Kinda

---

       [27] The actual Snapchat username of MINOR 5 is known to law
enforcement but has been redacted in this affidavit to protect
the victim's identity.

70.   The conversation between MINOR 5 and CALI.REPTILES continued.   The portion below occurred a couple hours later.

CALI.REPTILES: Don't tell anyone when we fuvk

Ok?

MINOR 5:      Lmao who said we were gonna? [EMOJI]

CALI.REPTILES: I did

Soo fr[28] when we fuck don't tell anyone

MINOR 5       No I don't wanna get raped by a 24 year old [EMOJI]

CALI.REPTILES: Well it's gonna happen

So just enjoy it

MINOR 5:      No [EMOJI]

CALI.REPTILES: No?

Lol you better enjoy it when I'm fucking you

MINOR 5:      No [EMOJI]

CALI.REPTILES: What you gonna cry when we fucking?

MINOR 5:      Yeah [EMOJI]

CALI.REPTILES: Nahh you won't

Actually you will at first

Wanna know why?

MINOR 5:      Why

CALI.REPTILES: Because your pussy is tight

And my dick is big

---

[28] I know from training and experience and similar investigations involving chat communications that "fr" is short for "For Real."

| | |
|---|---|
| | So it will kinda hurt when i force it in |
| MINOR 5: | K |
| CALI.REPTILES: | So ya you will cry at first |
| MINOR 5: | Mk |
| CALI.REPTILES: | But after that you'll be moaning like crazy |
| MINOR 5: | Nice |
| CALI.REPTILES: | But I'm going to meet you soon |
| MINOR 5: | No |
| CALI.REPTILES: | No? Why not? |
| MINOR 5: | Yeah |
| CALI.REPTILES: | Why not? |
| MINOR 5: | Cause |
| CALI.REPTILES: | Tell me why |
| MINOR 5: | I'm not tryna get raped |
| CALI.REPTILES: | Well it's gonna happen Ok let's do this Let's keep texting and I won't rape you yet Deal? |

71.  The conversation between MINOR 5 and MENDOZA continues through October 24, 2020.  During that period time MENDOZA continues to make threats to MINOR 5 about going to her house, raping her and getting her pregnant.  MENDOZA continues to make

such threats up and until the end of their communications on
October 24, 2020, which is demonstrated below:

        CALI.REPTILES: So let's make a deal

                       Ok?

        MINOR 5:       No

        CALI.REPTILES: Bitch

                       You serious?

                       You know i have your address right?

        MINOR 5:       Yeah I know

                       U told me

                       Remember?!

        CALI.REPTILES: And you know i can go rape you right?

        MINOR 5:       I don't care

        CALI.REPTILES: Do you want that?

        MINOR 5:       I don't care

        CALI.REPTILES: You don't care if i rape you?

        MINOR 5:       Nope

        CALI.REPTILES: Ok good that's all i need

                       We won't use a condom tho

        MINOR 5:       Okay

        CALI.REPTILES: You better hope your pussy isn't tight

                       Is it tight?

                       Is it?

        MINOR 5:       How am I suppose to know what that

                       means?? I'm 12 [Emoji]

        CALI.REPTILES: I mean you never had sex right?

        MINOR 5:       Nope

```
CALI.REPTILES: So that means you are tight

MINOR 5:        Okay?..

CALI.REPTILES: And that's good for me

                But not for you

                Wanna know why?

MINOR 5:        Why

CALI.REPTILES: Because my dick is big

                So it will hurt at first

                When i put it in

MINOR 5:        Okay

CALI.REPTILES: I have a question

                Do you think I'm playing?

                Forreals tho

                Tell me

                ?

MINOR 5:        No

                And I don't care
```

72.   MENDOZA then used his "CALI.REPTILES" account to send MINOR 5 one photo depicting an arial view from Google Maps of what is believed to be the location of MINOR 5's residence.

> 5.   MENDOZA uses "CALI.REPTILES" to offer money to Snapchat user "LB69" in exchange for being his girlfriend and sends photo of paycheck deposit from his employer.

73.   The communications between MENDOZA (aka "CALI.REPTILES") and "LB69" begin on October 27, 2020.  During that conversation MENDOZA offers to pay her and buy her things in exchange for her being his girlfriend. A portion of that

conversation is detailed below and began on October 2, 2020, at
10:11 am (UTC):

| | | |
|---|---|---|
| CALI.REPTILES: | I'll make you a better deal |
| LB69: | Okay what's that? |
| CALI.REPTILES: | First are you single? |
| LB69: | Yes |
| CALI.REPTILES: | Ok I'm looking for a boo[29] |
| LB69: | Okah |
| CALI.REPTILES: | It comes with perks |
| LB69: | What's that |
| CALI.REPTILES: | $ haha |
| LB69: | Oh okay |
| CALI.REPTILES: | Depends tho could be $50-$600 |
| LB69: | Right |
| CALI.REPTILES: | You interested? |
| LB69: | Maybe |
| CALI.REPTILES: | Sorry |
| | I was looking for a yes lol |
| | So do you want to be my boo? Lol |
| LB69: | Sure |
| CALI.REPTILES: | For reals tho |
| | Like I'll be buying you stuff too |

74.   MENDOZA then used his "CALI.REPTILES" account to send
"LB69" one "selfie-style" photograph depicting the face of a

---

[29] I know from training and experience and similar
investigations involving chat communications that "boo" is a
term used to describe a significant other such as a girlfriend
or boyfriend.

male Hispanic adult.  The man in the photo appears to be the
same person depicted on Kresimir MENDOZA's California State
Identification Card.  He then writes the following:

      CALI.REPTILES:   That's me btw[30]

      LB69:          Awh you'e cute :)

      CALI.REPTILES:   I know I am

                     Lol

                     I got big lips too

                     Send me a picture of you

      LB69:          Okay

                     Spoil

      CALI.REPTILES:   No one I can keep dummy lol

                     One from your gallery

      LB69:          Cashapp me

      CALI.REPTILES:   I will not rn tho

                     I get paid Thursday

                     So in two days

   75.  MENDOZA then used his "CALI.REPTILES" account to send
"LB69" one photograph depicting what appears to be a screen
capture showing a direct deposit from his employer into his bank
account.  The photo shows that on April 15, 2021, a "Payroll"
deposit from "Target Corp," made to "Kresimir Mendoza" in the
amount of $642.80.  He then writes the following.

       CALI.REPTILES:   That's how much I make a week

                      Or more if I do overtime

---

   [30] I know from training and experience and similar
investigations involving chat communications that "BTW" is short
for "By the way."

E.    **Fourth Lead: MENDOZA Identified by Law Enforcement in
      Colorado for Soliciting MINOR 6, a 14 year-old Female
      for Nude Images**

76.   From my review of investigative reports written by
Investigator Rachel Impson with the Jefferson County Sheriff's
Office in Colorado, as well as communications I had with Inv.
Impson, I learned the following:

      a.    On or about May 6, 2021, law enforcement in
Colorado received a call from MINOR 6's mother who reported that
an unknown male, using the Instagram username "BENT7385" had
been communicating with her 14-year-old daughter, MINOR 6, and
threatened to show up to her house if she did not send him
"nudes."

      b.    On May 7, 2021, law enforcement in Colorado
conducted an interview with MINOR 6. During the interview MINOR
6 stated that in the past she has taken nude photos of herself
and sent them to others online. MINOR 6 said she was not proud
of what she did and estimated that 30 or more users had nude
photographs of her.

      c.    MINOR 6 said that "BENT7385" added her as a
friend on Instagram two days prior to his threatening message,
but she ignored him during that time. She then noticed he wrote
a comment on her Instagram stating, "If you block me or
something I'm coming to your house."  MINOR 6 said she opened
the comment and saw he further wrote, "Well if you don't do what
I say, I'm going to come to your house." MINOR 6 said the
"BENT7385" asked her for her "nudes" and she told him she was

not going to send those kinds of pictures to him. "BENT7385" told her he was going to come to her house.  MINOR 6 told law enforcement that "he had my address on a map." She said the map showed ["BENT7385"] was "three minutes away" from her house. MINOR 6 said that "BENT7385" started to count down the time of when he was going to arrive.  MINOR 6 told her mother about the incident. According to MINOR 6, her mother said that she saw pictures of the front of their house sent from the "BENT7385", but MINOR 6 was not sure if that was true because her mother did not tell the truth a lot.

     d.   MINOR 6 believed that "BENT7385" may have been someone she previously communicated with a week earlier on Snapchat or Addchat because she remembered one or two users from those platforms asking for her Instagram username.  MINOR 6 informed law enforcement that her Instagram profile stated that she was 18 years old, when asked what the reason for that was, MINOR 6 stated that the application requested its users be 18 and over.

     e.   MINOR 6 stated that on the day "BENT7385" requested her nude photographs, "BENT7385" tried calling her a few times, via Instagram video chat, but she did not answer.

    77.  On June 3, 2021, Inv. Impson obtained a "Production of Records," granted by 1st Judicial District County Court Judge Jennifer Melton, requesting that Facebook Inc. provide information relating to Instagram account "BENT7385."  On or about June 16, 2021, Facebook Inc. responded and provided information relating to the request. In part, Facebook Inc.

reported that "BENT7385" was created on May 5, 2021 and registered with the phone number 909-871-8007 ("SUBJECT PHONE NUMBER 2") which they reported was "unverified." Facebook Inc. also provided records detailing IP address logins. I reviewed those login records and found that between May 5, 2021, and May 6, 2021, "BENT7385" was logged into approximately 18 times, including 3 times from SUSPECT IP 3 (previously identified by Charter Communications as being assigned to Juan Mendoza at the SUBJECT PREMISES).

78. On July 14, 2021, Inv. Impson obtained a "Production of Records," granted by 1st Judicial District County Court Judge Bradley Burbach, requesting that T-Mobile provide information relating to SUBJECT PHONE NUMBER 2. On or about July 21, 2021, T-Mobile responded and reported that SUBJECT PHONE NUMBER 2 was assigned to Kresimir Mendoza at the SUBJECT PREMISES and that the account was activated on April 30, 2021. T-Mobile also identified the IMEI of the device, 353776391201769, assigned to receive service. I conducted search of the IMEI 353776391201769 within IMEI.INFO, and free online database search tool for identifying phone make and model from information such as the IMEI. The result of my search showed that IMEI 353776391201769 is assigned to an Apple iPhone 12 Pro Max[31].

---

[31] From training and experience, as well as similar investigations, I am familiar with the Apple iPhone 12 Pro Max and the rear facing cameras that are standard on that phone. It appears to be the same type of phone seen in the reflection of the aquarium in videos referenced in Paragraph 49.

F.   **SURVEILLANCE OF SUBJECT PREMISES**

79.   On May 27, 2021, at approximately 12:10 pm, I parked across the street from the SUBJECT PREMISES and conducted surveillance.  I saw the following vehicles parked at, or in front of, the SUBJECT PREMISES:

a.   Parked in the west side of the driveway was a white Toyota RAV4 with California license plate 7UPS754.

b.   Parked on the east side of the driveway was a silver Toyota RAV4 with California license plate 4EEL600.

c.   Parked in front of the silver Toyota RAV4, closest to the SUBJECT PREMISES, was a gold-colored Chevrolet Impala with California license plate 5BMP956. The vehicle appeared to be nonoperational as it was covered in dirt and dust and appeared to have at least one flat tire.

d.   Parked in between the two Toyota RAV4s, and closest to the front door of the SUBJECT PREMISES was a dark colored Mazda 6 with California license plate 7FPS581.

e.   Parked on the street in front of the SUBJECT PREMISES was a dark colored Chevrolet Malibu with California license plate 7ZCK694.

80.   At approximately 1:00 pm, I saw a female adult, appearing to be the same female depicted on Irene Vasquez De Mendoza's California drivers license photo, exit from the backyard of the SUBJECT PREMISES.  The female opened the large wooden gate that secures the driveway that leads to the rear of the property on the west side of the SUBJECT PREMISES.  The female then walked over to the white RAV4 with California

license plate 7UPS754 and entered the driver's seat and departed west on Bohnert Avenue. At approximately 1:20 pm, I terminated the surveillance and departed from the location.

81.  I subsequently conducted records checks within databases maintained by the DMV for the vehicles I saw at the SUBJECT PREMISES and learned the following:

a.  The white Toyota RAV4 with California license plate 7UPS754 seen departing the SUBJECT PREMISES is registered to Juan Mendoza and Irene Vazquez De Mendoza at the SUBJECT PREMISES.

b.  The silver Toyota RAV4 with California license plate 4EEL600 is registered to George Mendoza at the SUBJECT PREMISES.

c.  The gold-colored Chevrolet Impala with California license plate 5BMP956 is registered to Hope Hancorne at 2004 Shorter Street, San Bernardino, California.

d.  The Mazda 6 with California license plate 7FPS581 is registered to George Mendoza and Irene Vasquez at the SUBJECT PREMISES.  Irene Vasquez De Mendoza is also known as Irene Ponce Vasquez.

e.  The dark colored Chevrolet Malibu with California license plate 7ZCK694 is registered to Hope Hancorne at the SUBJECT PREMISES.

82.  On June 30, 2021, at approximately 11:00 am, I arrived at the SUBJECT PREMISES to conduct surveillance.  I parked across the street from the SUBJECT PREMISES on Bohnert Avenue. In addition to the two vehicles registered to Hope Hancorne and

the silver Rav4 registered to George Mendoza that I previously observed at the SUBJECT PREMISES, I saw the following vehicles parked at, or in front of, the SUBJECT PREMISES:

       a.    Parked in the driveway closest to the street was a black Nissan Altima with California license plate 7GBP056.

       b.    Parked in the driveway in front of the Nissan Altima was a grey colored Ford truck with California license plate 6A56947.

83.  At approximately 11:00 am, a female adult, appearing to be the same female depicted on Irene Vasquez De Mendoza's California driver's license photo, appeared from the backyard of the SUBJECT PREMISES using the side gate located on the west side of the residence.  The female was holding a water hose and seen watering plants and trees on the property.  A short time later, the female walked back into the rear of the property using the same side gate.

84.  At approximately 11:45 am, I saw a male adult (not Kresimir MENDOZA) and a female adult (different than the one believed to be Irene Mendoza) appear from the side gate leading to the backyard of the SUBJECT PREMISES.  The two walked over to the Nissan Altima where they began kissing.  A short time later, the female entered the driver's seat and drove away.  The male adult walked into the SUBJECT PREMISES using the front door.  At approximately 12:30 pm, I terminated the surveillance and departed from the location.

85.   I subsequently conducted records checks within databases maintained by the DMV for the Nissan Altima and the Ford truck and learned the following:

a.   The Nissan Altima with California license plate 7GBP056 is registered to Alicia Lopez or Salvador Diaz Lopez at 1214 W. Victoria Street, Rialto, California.

b.   The Ford truck with California license plate 6A56947 reports having valid registration from May 31, 2019 until May 31, 2020, however, no business or person is listed. There is a note for this registration identifying that vehicle registration was suspended effective November 17, 2017.

86.   On August 25, 2021, at approximately 1:30 pm, I arrived at the SUBJECT PREMISES to conduct surveillance.  I parked across the street from the SUBJECT PREMISES on Bohnert Avenue and saw the following vehicles parked at, or in front of, the SUBJECT PREMISES:

a.   Parked on the street in front of the SUBJECT PREMISES was the dark colored Chevrolet Malibu registered to Hope Hancorne at the SUBJECT PREMISES.

b.   Parked in the driveway in front of the SUBJECT PREMISES closest to the street was the silver Toyota RAV4 registered to George Mendoza at the SUBJECT PREMISES.

c.   Parked in in the driveway in front of the silver RAV4 was the gold-colored Chevrolet Impala registered to Hope Hancorne. The vehicle appeared to be parked in the same place as when I last saw it previously.

      d.   At approximately 1:40 pm, I saw a grey colored pick-up truck with a grey camper shell pull into the driveway in front of the wooden gate on the west side of the SUBJECT PREMISES that leads to the rear of the property.  A male adult exited from the vehicle and opened the wooden gate.  The male adult appeared to be the same person depicted on Juan Mendoza's California driver's license.  The male adult reentered the grey truck and drove it in to the rear of the property and out of my line of sight.  Shortly after, I saw the male adult appear from the backyard and close the wooden gate.

      e.   At approximately 2:05 pm, I saw a grey colored Honda sedan pull into the driveway of the SUBJECT PREMISES.  The vehicle had weathered paper license plates that were not legible.  The driver of the car stayed in the vehicle.  Approximately, five minutes later, a silver-colored BMW sedan parked on the street in front of the SUBJECT PREMISES.  A Hispanic male adult (not Kresimir MENDOZA) exited the vehicle from the driver's seat.  A second Hispanic male adult exited from the front passenger seat of the vehicle.  The passenger was same Hispanic male adult I saw on June 30, 2021, walking the female out to her card and kissing her.  The two male adults walked away from the BMW and directly over to the grey Honda parked in the driveway of the SUBJECT PREMISES where they all appeared to sit and converse with one another.

      f.   At approximately 2:10 pm, I saw the same female adult, believed to be Irene Vazquez De Mendoza, driving the white Toyota RAV4, registered to Juan Mendoza and Irene Vazquez

De Mendoza, pull into the driveway of the SUBJECT PREMISES.
Once the car was parked, I saw the female exit the vehicle from
the driver's seat and began walking toward the front door of the
SUBJECT PREMISES.  I also saw a male adult, appearing to be the
same person depicted on Kresimir MENDOZA's California
Identification Card, exit from the rear driver side area of the
vehicle and follow right behind the female adult into the front
door of the SUBJECT PREMISES.  As the two made their way to the
SUBJECT PREMISES, they both looked at, and seemed to
acknowledge, the individuals sitting in the grey Honda parked in
the driveway.

     g.   At approximately 2:45 pm I terminated
surveillance and departed the residence.

## VI.   <u>TRAINING AND EXPERIENCE ON CHILD PORNOGRAPHY INVESTIGATIONS</u>

     87.   Based on my knowledge, experience, and training in
child exploitation and child pornography investigations, and the
training and experience of other law enforcement officers with
whom I have had discussions, there are certain characteristics
common to individuals involved in the receipt and collection of
child pornography:

     a.   Child pornography collectors may receive sexual
gratification, stimulation, and satisfaction from contact with
children; or from fantasies they may have viewing children
engaged in sexual activity or in sexually suggestive poses, such
as in person, in photographs, or other visual media; or from
literature describing such activity.

b.   Collectors of child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, slides, and/or drawings or other visual media. Child pornography collectors oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Collectors of child pornography almost always possess and maintain their "hard copies" of child pornography material, that is, their pictures, films, videotapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location, and sometimes will keep them in several separate locations.  Child pornography collectors typically retain pictures, films, photography, negatives, magazines, correspondence, books, tape recording, mailing lists, child erotica, and videotapes for many years.

d.   Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area, on their persons if they are carrying a portable digital device, or in their vehicles.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e.   Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, address, and telephone numbers of individuals with whom they have been in contact and who share the same interest in child pornography.

f.   When collectors of child pornography distribute and receive child pornography through e-mail accounts or other internet communication platforms, they sometimes delete copies of all such e-mails or correspondences to avoid detection after they have saved the files of child pornography to their computer, digital media, or other online storage service, i.e., external hard drives, thumb drives, and or cloud drive.

g.   Collectors of child pornography prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.   Collectors of child pornography frequently move files of child pornography from one digital device to different digital devices in an attempt to avoid detection.  Collectors of child pornography frequently store their collections of child pornography on different digital devices for the increased storage space different digital devices offer over other devices, e.g., laptop computers typically have more storage

space than cellphone or iPods.

      i.  Child pornography collectors rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.  The known desire of such individuals to retain child pornography together with the sense of security afforded by using computers, provides probable cause to believe that computer images, especially child pornography and erotic nudity involving minors, will be retained by the collector indefinitely.  These individuals may protect their illicit materials by passwords, encryption, and other security measures.  These individuals may also protect their illicit materials by saving it on movable media such as memory cards, memory sticks, CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted, or sent to third party image storage sites via the Internet.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[32]

    88.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[32] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

89.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

90.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

c.   Users may enable a biometric unlock function on some digital devices, like, for example, the iPhone XR (IMSI: 310260343427273) reported as being assigned to the SUBJECT PHONE NUMBER 1 and the SUSPECT IP 2; and the Apple iPhone 12 Pro Max T-Mobile reported as being assigned to the SUBJECT PHONE NUMBER 2.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

d.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      e.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any devices that appears to have a biometric sensor and fallS within the scope of the warrant: (1) depress MENDOZA's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MENDOZA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

91. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    **CONCLUSION**

92. For all the reasons described above, there is probably cause to believe that MENDOZA has committed a violation of Title 18, United States Code, Sections 2251(a) (Production of Child Pornography) and 2 (Aiding and Abetting). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES and on MENDOZA, as described in Attachments A-1 and A-2.

_____
JONATHAN RUIZ, Special Agent
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __27th__ day of
August 2021.

_____
UNITED STATES MAGISTRATE JUDGE

<u>**ATTACHMENT A-1**</u>

<u>**PROPERTY TO BE SEARCHED**</u>

The premises to be searched is the residence located at 18470 Bohnert Avenue, Rialto, California 92377 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is located on the north side of Bohnert Avenue just east of North Linden Avenue and just west of North Maple Avenue. The SUBJECT PREMISES is a single-story residence with a detached garage located in the rear of the property.  There is a second detached structure, approximately the same size as the main residence, located in the middle of the property in between the main residence and the detached garage.  The front door to the residence faces south towards Bohnert Avenue and had a white metal security door affixed to it.  The numbers "18470" are affixed to the eave just above the front door. The exterior walls of the residence are stucco painted white, the trim is a faint blue/grey color, and the roof is made of grey colored shingles.  The front perimeter of the property has a short cinderblock wall with pillars approximately every six feet.  In between each pillar is a black wrought iron fence. There is a half-circle shaped driveway connecting one driveway entrance located on the west of the property with another driveway entrance located on the east side of the property. The driveway entrance located on the west side of the residence also appears go back to the rear of the property where the detached garage is located.

The area to be searched includes the entire property located at the SUBJECT PREMISES, including the driveway,

i

outbuildings, garages, storage spaces, as well as all vehicles on or adjacent to the SUBJECT PREMISES that are registered to or under the control of Kresimir MENDOZA.





## <u>ATTACHMENT A-2</u>

### <u>PERSON TO BE SEARCHED</u>

The person to be searched is Kresimir MENDOZA ("MENDOZA"), including his clothing, any pockets in his clothing, his belt, anything attached to his belt, and any bags or containers in his possession, provided that he is located within the Central District of California at the time of the search.  According to MENDOZA's California Depart of Motor Vehicles information, he stands 5 feet 3 inches tall, weighs 105 pounds, and has brown eyes and brown hair.

Date of Birth: xx-xx-1996[33]

Social Security Number XXX-XX-2409[34]



---

[33] Law enforcement has Kresimir MENDOZA's full date of birth, but only a portion of it is provided here for privacy reasons.

[34] Law enforcement has Kresimir MENDOZA's full social security number, but only a portion of it is provided here for privacy reasons.

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 2251(a) (Production of Child Pornography), 18 USC 2252(d) (Advertisement of Child Pornography), 2251(c) (Sexual Exploitation of Children), 2252A(a)(2)(A) (Receipt and Distribution of Child Pornography) and 2252A(a)(5)(B) (Possession of Child Pornography) (collectively, the "SUBJECT OFFENSES"), namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons "SUSPECT A," "SUSPECT B," and "SUSPECT C" involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or

transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.   Records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to peer-to-peer file sharing software.

g.   Records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

h.   Records or documents which tend to identify who has dominion and control over each room or location to be searched, limited to 15 items per room or location.

i.   Any digital device which is itself or which

contains evidence, contraband, fruits, or instrumentalities of the TARGET OFFENSES, and forensic copies thereof.

j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

                viii. records of or information about Internet
Protocol addresses used by the device; and

                ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

    3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations, Microsoft Xboxes, and Nintendo Switches);
peripheral input/output devices, such as keyboards, printers,
scanners, plotters, monitors, and drives intended for removable
media; related communications devices, such as modems, routers,
cables, and connections; storage media, such as hard disk
drives, floppy disks, memory cards, optical disks, and magnetic

tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure while the digital devices or forensic copies thereof are not connected to the Internet or a network (such as in "Airplane Mode"):

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

   ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

  c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

  d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

  e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

  f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device

7.   During the execution of this search warrant, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress Kresimir MENDOZA's thumb and/or fingers on the device(s) (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device(s) in front

of Kresimir MENDOZA's face with his eyes voluntarily open to
activate the facial-, iris-, and/or retina-recognition feature,
in order to gain access to the contents of any such device.  In
depressing a person's thumb or finger onto a device and in
holding a device in front of a person's face, law enforcement
may not use excessive force, as defined in *Graham v. Connor*, 490
U.S. 386 (1989); specifically, law enforcement may use no more
than objectively reasonable force in light of the facts and
circumstances confronting them.

    8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.